My name is Trey Kitchens. I represent the estate of James Buddy Turner in the grant of summary judgment from the court in the Western District of Arkansas. Members of the court, in the 23 years that I've practiced law, I've never had an order or ruling that mentioned one word about how I was dressed because it was never relevant to anything that I've done. However, I would venture to say in this particular matter, if I was making this argument to you completely naked, it might at least be a footnote in your ruling. In this case, the court ruled on summary judgment that my client was found sitting in the jail on the floor wrapped in a shower curtain. What the court left out was that he was completely naked and had been completely naked for several hours under a deliberate indifference standard for someone that is an inmate in a county jail that is an incredibly salient point that the court left out to determine whether or not it was a deliberate indifference to a known medical condition. I say that because the background that I'll give you now is colored by the court's ruling that left out that incredibly important fact. My client was arrested on Friday evening. There was a child support issue and there was contempt from the judge for him to do 30 days in jail. It is undisputed that when he was arrested, he was drunk. He got to jail and told the jailer that he was drunk and had been drinking. The jailer who took him and did the intake noted that he smelled of alcohol and specifically was told that he was drunk. Throughout the time that my client was in the jail and he was there approximately 43 hours before he was found dead, there was not a time that he had an interaction with the jailer where a jailer did not note that he smelled of alcohol. His second day in the jail, May 16th, 2018, the jail received at least three, we contend four, but you can call it three. It's not a seminal difference. Three different calls from independent family members who told the jailers three different times, hey, Buddy's an alcoholic. He's gonna go through DTs. You need to watch him. The sheriff, Sheriff Dunn, said if that had happened, if I had gotten three different calls saying he was going to go through DTs and that he was an alcoholic, we would have treated him differently. He would have had a higher level of supervision. He would have had a higher level of observation. Sheriff Dunn's problem is that's exactly what happened. Those three calls are not in dispute. There may have been a fourth, but I will concede for the purposes of this argument, it was only three, which we believe would be more than enough. The Applees make the argument that they asked Buddy, do you need medical attention? And he said no. The response to that is a simple one. The duty that the county had to provide medical care for this individual was not contingent on whether or not he asked for medical care. If that was the case, there would not be suicide watches in jail. They would just let you do it if that's the decision you made. And it is undisputed he was drunk when he got there and they had full knowledge that he was an alcoholic going through DTs. That is not in dispute. Counsel, is there any case law guidance that you can provide to us for the peers that may be in medical distress? Your Honor, there are a line of cases that talk about a religious exemption. If you are denying you don't want medical care due to a religious conviction, that is not what we have here. This is something, and there was testimony from members of the Calhoun County Sheriff's Department that talk about people that are alcoholics and that are actively intoxicated do not tend to make particularly good decisions. Under the Hall versus Ramsey County case, this court indicated that what you have to do and the analysis that needs to be conducted is both an objective and subjective analysis of the particular facts of a given case. We believe in this case we have both an objective and subjective need for medical care, including knowing for at least two hours on the third day that Buddy was in jail that he had been walking around the jail naked and smelling of alcohol, and the last jailer to talk to him before he was found dead, lying on the floor naked, said when he asked him, hey buddy, you okay? His response was, eh. That's objectively what we have here, and the affilee is contending that that's fine. That having somebody who is non-responsive, he responded with, eh, not a word. He'd been walking around and sitting on the floor and completely naked, knowing he's an alcohol, knowing he smells of alcohol, knowing he's going to go through DTs, that that's okay. That that is sufficient and not deliberate indifference to a known medical condition. Now the ignorance of the Calhoun, members of the Calhoun County Sheriff's Department is fairly glaring in this case because to a man they all said we didn't know that DTs and alcohol withdrawal was a serious medical condition. They testified about that under oath. There are also some conflicting testimony from Sheriff Dunn. One of the jailers, Mr. Hannigan, said Sheriff Dunn came in and told me, watch buddy close. Buddy's an alcoholic, make sure you watch him close. Sheriff Dunn said that never happened. The stage of where we are in this case was summary judgment. That fact and dispute is something that should have defeated summary judgment based on the deliberate indifference standard. Additionally, there are facts and disputes about how often that buddy was being observed. The court ruled in its order that there was a policy and procedure at the jail that buddy was to be checked on every hour. And the court found that in its order. However, there's no citation in the order of where that's in the record. And actually in the record, at the athlete's brief on page nine, it talks about the link on the third day. There was approximately two hours, or a little less than two hours, in between when they saw him and he had the response of, eh, and then when they found him naked and dead in the middle of the jail room floor. Do you think our case in Ivey versus Audrain County, which was over Judge Graza's dissent, but do you think that case has any applicability to our situation? Your Honor, with respect to the, one of the things that I have avoided is arguing something like the summary judgment standard. I think it's well established. The same argument with the deliberate indifference standard about a known medical condition that was ignored, a known serious medical condition that was ignored. I think factually this case would stand alone with respect to that. And the fact that the district court ignored the fact in its order that if he hadn't have been naked, I think this would be a different case. If he hadn't have been naked for a while, I think this would be a different case. To gloss over that fact, to ignore that fact when you have a body of knowledge, it was unquestioned, they were repeatedly told, this guy's an alcoholic, he's gonna go through DTs, please watch him. It is undisputed that the sheriff said, if I had that information, which he did, I would have done something different. And it is also glaring to me that the appellees in their brief, they won't mention that Buddy was lying there naked because it is such, I believe, a seminal issue that got ignored by the district court in this case. With that, I'll reserve my time. And if there are no other questions. Thank you. Mr. Newell. Thank you, Your Honor, and police court. Bert Newell, arguing here today on behalf of the appellees. First of all, being naked in a county jail has never been held by any federal circuit to be evidence of a serious medical condition. Well, counsel, I think you'd admit there were a lot more factors than just his clothing status. That's right, Your Honor. I'm replying to counsel's argument in the order that it was given, if I may. If there's no serious medical condition, there simply cannot be an instance of deliberate indifference. And the Turner estate has not argued that in its brief. The Turner estate, in its brief, has raised four specific points that it believes created error that this court should rectify. The first one, the first instance on page 20 of Turner's brief, says that Brandon Turner, Buddy Turner's son, testified in his deposition that he heard Buddy, or that he told the arresting officer that his dad had been sick and that he needed, he wanted to go to the doctor. The reason that's not a material fact in dispute is because as soon as they got to the jail, the first thing that Glenn Johnson asked Buddy Turner was, did he want to go to the hospital? Did he want to be seen by anybody? Buddy Turner said, no, I don't. And then he proceeded, they proceeded to have a two hour conversation and Buddy was mad because he had been arrested and he was mad at his soon to be ex wife and he railed on about that. Buddy was... Counsel, do you believe that the issue of whether there was obvious medical distress has been waived? I have... I didn't... That has not been argued. The district court found... No, I'm talking about in terms of the appellate briefing. I do. I do. I think because of the instance pointed out by the court in footnote two, with regard to the failure to raise objection to the undisputed material facts, that this court would have a hard time getting to that. In other words, the record on appeal, the facts that the district court relied upon, the facts that are in the appellate's brief here, that the court cited in the summary judgment order have not been disputed in the pleadings. They have been disputed here and I'm trying to... I would like to address them because I believe that even if they had been raised, they're not material facts. They are... There's a divergence of facts but they're not material. That... The first one I just mentioned about him, whether or not it's... Whether or not it's outcome determinative that he asked to be seen by a doctor as soon as he was arrested. It wasn't because he was asked that 30 minutes later and he declined. The second instance cited by Turner in the brief is... He says there's no evidence of record that Turner was watched on an hourly basis for 43 hours. But again, that was not raised in... That was not raised at summary judgment and it's not been raised in the appellate brief except by pointing it out here. The other instance, the third instance was that there seems to be a dispute about Glenn Johnson receiving a phone call from Brandon Turner at 4.25 p.m. and what's pointed out as divergent is that there were four calls. But my argument is over a course of 43 hours, he was asked at least three times, three times in less than two days, whether he needed to go or even wanted to go to seek medical care. And I don't believe that the difference between four and three is... It should be determinative of anything. Even if that's so, I'd like to go back to the deliberate indifference issue. If they knew that he was intoxicated, if they knew that he was an alcoholic, if they knew that he would be going through withdrawal and they knew that he was naked and they knew he was sitting on the floor wrapped in a shower curtain, why isn't it obvious that Turner was in medical distress? Well, there's a lot to unwrap there because those instances occurred over the...at various times over the 43-hour period. For instance, the fact that he was naked and sitting in a cell was only observed late in the morning of the day that he died, it was like two hours before. He was also...he was out of his cell. He wasn't laying on the floor under...naked under a shower curtain. He was sitting up watching television out in the pod. And Jared Hannigan walked in, said, you need to get dressed. And he...and Buddy said, I want some ibuprofen. Jared Hannigan went back, brought him a pitcher of water with four ibuprofen. And he was...he was sitting up. Yes, he was naked, sitting in...sitting in a cell with a shower curtain. I wish I could say that was the only time I've had that come up. It...I don't know why it comes up. I don't know why inmates decide to disrobe, but it's...there's never been a case that says that is evidence of a serious medical condition. There...as Judge Colleton wrote in Barton v. Tabor, the Constitution does not require an arresting law enforcement officer to seek medical attention for every arrestee who appears to be intoxicated. And that's the difference I...the problem I have with that Turner Estate is trying to conflate intoxication upon arrest as with a serious medical condition. It's just simply not. It's commonplace, unfortunately. And also, with regard to the effects of alcohol withdrawal, it may be a serious medical condition. I'm not saying it's not. All I'm saying is there is not a robust consensus in this circuit or any circuit that has held that. And that is, I believe, one of the importances of the Audrain County case. And with regard to Your Honor's dissent, I understand that because the facts of that case are so much different than this case. In that case, Ivy was arrested while under the influence of heroin, fentanyl, methadone, and something else. He had defecated on himself. He had vomited. He was incoherent on the street arrest. They took him to the ER because of that. The ER gave him a pass, if you will, take him back to the jail. When he got back to the jail, he vomited again and defecated on himself again. The jailers took him and cleaned him up, took him back to his cell. He did it again. This is all on the evening of the arrest. And so my point for raising that case at summary judgment and again here today is that I understand the dissent because of the facts in that case. But this case is so factually different. Buddy Turner may have been drunk, but he was a professional addict. He was a life, he had, unfortunately, he was a chronic alcoholic. He had held the same job for 29 years until he, half a year before this, he had been hospitalized. And they told him at Baptist Hospital, if you drink again, it's going to kill you. Both his sister testified to that and his son testified to that. And he tried. And he stayed sober for about four months and then he started drinking again. He lost his job. He was living with his son. He was drinking every day. And he said that he got sick the day of his arrest, that he had been vomiting. But he never went to the doctor. His son said he didn't even have a doctor in Hampton. And when his son got home from work that day, his son didn't take him to a doctor. In most cases, the corrections officials don't have the benefit of outside information with a diagnosis or a warning. In this case, we do. Does that make a difference? It makes a difference because neither Ms. Stogsdale or Mr. Turner Jr. or Lauren Boyd, who was the daughter, they said, he's an alcoholic. No one said, watch him, he's going to have a serious medical problem. They just simply said, he's coming off of alcohol. I don't know if that answered your question. Well, I guess what you're saying, and let me put it in a different way, is that it's not clearly established that going through DTs is a serious medical problem. That's what I'm saying. I am saying that. And are there any cases one way or the other that talk about DTs as to whether they are or are not a serious medical condition? I have not. I have not found that. It's possible. You may know of one, but I don't. I've never seen it. And that's, I think that's the critical problem here. Thank you. Thank you. Mr. Kitchens, you've got about a minute and a half. Yes, sir. At 10 o'clock on the second, third day, but he was there, the jailer noted that he was walking around, not walking around, but he was naked in the pod of the jail. He was not in his cell, he was out in the main room. At 1.30 the same day, the jailer spoke to him, but he was nonresponsive. He simply said, hmm, when he was asked how he was doing. 2.30 in the afternoon, he was still naked on the floor. And at 3.02 in the afternoon, all of the same day, he was found dead. Those are the underlying facts that you have to couple with the fact that three different people called and said, you've got to watch him. He's going through DTs. Taken together with the fact that Sheriff Dunn testified under oath. If I had received three calls, I certainly would have done something different with Buddy. Well, he did receive three calls, and he did nothing different with Buddy. The jailers talk about that would be information that they would want to know. If there was an alcoholic going through DTs, they would want to know it, but they didn't have the information, or they at least claimed to not have the information going from jailer to jailer going through the shift. The record talks about there is a board where you write down in the Calhoun County Jail if a prisoner has a medical problem. Nothing was ever written down. Therefore, in the 43 hours that Buddy was at the Calhoun County Jail, going through DTs that they had full knowledge about, they simply let him lay there and die. Well, let me ask you the same question I just asked Mr. Newell. Are there any cases that say, let's assume it was obvious he was going through DTs. Are there any cases that say that a jailer should recognize that a person going through DTs is suffering from a serious medical condition that needs medical attention? Your Honor, I don't have a case that's on point with respect to that. I would observe that it was, according to the autopsy, it was chronic alcoholism that killed him. And the jailers all testified, we don't even know anything about DTs. We don't know anything about withdrawal. They testified about that to a man. And the issue is, they had a nurse on call. They could have picked up the phone. They could have done simple little things and Buddy would have had a chance as opposed to laying on the floor of the concrete floor of the jail and dying. All right, thank you Mr. Kitchens. Mr. Newell, we appreciate your arguments. The case is submitted.